## Casteel Adoption

*Thomas H. Hudson, Jr.,* for respondents.

REILLY, P. J., February 15, 1972.—On November 9, 1971, this matter originated in this court on petition by Fayette County Child Welfare Services, an approved agency, seeking a decree of involuntary termination of parental rights of Ralph Casteel and Agnes Casteel, husband and wife, as to their daughter, Mary Jane Casteel.

On November 26, 1971, after hearing on November 23, 1971, a preliminary nisi 15 day order was entered granting the prayer of the petition as follows:

"And now, this 26th day of November, 1971, upon consideration of the foregoing Petition for Involuntary Termination of Parental Rights and of the hearing held thereon, the Court finds that the facts averred in said petition are true and correct and that the parents by conduct continuing for a period of

at least six months either have evidenced a settled purpose of relinquishing parental claim to the child, or have refused or failed to perform parental duties, and the testimony clearly indicates that the parents, jointly and severally, are not only unwilling to perform even minimal parental duties toward this child, but are also incapable of performing such duties, and that Ralph Casteel and Agnes Casteel have forfeited their parental rights with respect to said child, Mary Jane Casteel, and that the prayer of the petition should be granted;

"Now, therefore, it is ordered, adjudged and decreed that all parental rights of Ralph Casteel and Agnes Casteel to said child are hereby terminated, said termination to extinguish the power or the right of said Ralph Casteel and Agnes Casteel to object to or receive notice of adoption proceedings; and that the custody of Mary Jane Casteel is hereby awarded to Fayette County Child Welfare Services. Nisi fifteen (15) days."

From this order the parents of the child filed exceptions as follows:

"And now, December 10th, 1971, the respondents, Ralph Casteel and Agnes Casteel, his wife, by their attorney, Thomas H. Hudson, Jr., hereby file exceptions to the Decree of Court filed November 26, 1971, for the following reasons:

"(1) The Findings of Fact of the Court are largely based on incompetent hearsay testimony.

"(2) The Findings of Fact of the Court are contrary to the evidence presented.

"(3) The Conclusions of Law of the Court are contrary to competent evidence produced at the hearing.

"(4) The testimony not having been transcribed, and the Court having not yet filed its formal Opinion in this matter, your Petitioners ask leave to file further

Exceptions upon the transcription of the testimony and the filing of the Court's Opinion."

## HISTORY

Briefly stated, the record discloses on June 14, 1963, the child, Mary Jane Casteel, was adjudged to be a neglected child by the Juvenile Court of this county. The child, then four months of age, was placed into the custody and control of the Fayette County Child Welfare Services. The child has since remained in the custody of the Child Welfare Services, some eight years, and has never been seen by either of her parents during this period.

The child is and has been all this time in private foster home care under the supervision of the agency. The agency is desirous of placing the child for adoption. The parents, Mr. and Mrs. Casteel, resist this, refuse to consent to adoption and say they want Mary Jane back home.

Although Mr. and Mrs. Casteel have moved their "residence" some 12 times during Mary Jane's absence of 8 years, they have never lived more than 10 or 12 miles from Uniontown, where the agency is located.

## THE ISSUE

The petition for involuntary termination of parental rights is presented under section 312, Act 208, the "Adoption Act" of July 24, 1970, effective January 1, 1971, 1 PS § 312.

The question to be resolved is:

(1) Have the parents by conduct continuing for a period of at least six months *either* evidenced a settled purpose of relinquishing parental claim to the child, Mary Jane, *or* have they refused *or* failed to perform parental duties? (Italics supplied.)

(2) Have the repeated and continued incapacity,

abuse, neglect, or refusal of the parents caused the child to be without essential parental care, control, or subsistence necessary for her physical well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parents? Section 311, the Adoption Act.

The proof by competent testimony or evidence of any of the disjunctive conditions recited above will warrant, if not mandate, the court to judicially terminate parental rights.

## REVIEW OF THE TESTIMONY

A summary of testimony of the various witnesses, seriatim, may best serve the purpose of depicting the tragic picture we were compelled to exhibit.

Mrs. Julia Wise, a caseworker with the Fayette County Child Welfare Services for more than five years, was the petitioner's first witness. Mrs. Wise testified, inter alia, as follows:

On March 28, 1963, when Mary Jane was only six weeks old, she was admitted to the hospital with bronchial pneumonia, parenteral diarrhea and second degree burns from her waist to her ankles from urine. She recites that Mary Jane had been removed from the hospital on April 20, 1963, by her mother, contrary to doctor's orders.

On June 14, 1963, when Mary Jane was just four months old, she was placed in the custody of the Child Welfare Services as a neglected child by the Juvenile Court of this county. That order of the court has not been disturbed and the child remains to this date in the custody of the agency and, under the supervision of the agency, is in private foster home care. At the time the Juvenile Court awarded custody of Mary Jane to the agency, Mr. Casteel was in jail

on a charge of assault and battery, and Mrs. Casteel had no place to keep Mary Jane and the other three children.

Mr. and Mrs. Casteel have at no time since Mary Jane was four months old visited or seen her. They did request on numerous occasions that Mary Jane be returned to their home. The agency did not disclose the whereabouts of Mary Jane, following a policy of anonymity as to the foster home parents. They rightfully refused or declined to return Mary Jane to her parents' "home"; however, on several occasions they made arrangements to have Mary Jane at the agency offices for visitation by the parents. On none of these occasions did either Mr. or Mrs. Casteel keep the appointment, their only excuse now being that they had no means of transportation to the agency, and no one came to bring them in. On each occasion when a visitation was arranged, the agency went to the trouble of preparing the child and bringing her to the agency offices for the purpose of the visitation, but on none of these occasions did either of the parents appear. Mr. Casteel on these occasions stated that he did not wish to see the child until such a time as conditions in their home could be rectified to the point where the child could be returned home.

Christmas of 1970 was the only Christmas Mrs. Casteel did anything to indicate that she even remembered Mary Jane. On this occasion she sent, through Mrs. Wise, a baby doll to be given to Mary Jane. On another occasion Mrs. Casteel gave Mrs. Wise a pair of hand-me-down shoes to be taken to Mary Jane to see if they fit her.

There is testimony that in the various homes where the Casteels lived there were no beds, no running water, that the houses, both inside and outside, were

cluttered with debris, were stenchfully filthy and squalid, and the children were exceptionally filthy and lice infested and were improperly nourished.

During this period the Casteels moved some 12 times, but no improvement from the conditions recited was noticeable from house to house. Some of the migrations were occasioned by evictions and four times they were burned out. These changes from one residence to another, of course, involved changing schools for the children who were at home, involving in all seven different schools in the past five years.

Mrs. Wise testified that the Casteel children, while in the John F. Kennedy School, smelled so badly and were hygienically so offensive they had to be placed in the hall outside the classrooms because the other children became sick and many parents of the other children complained of these conditions. It was explained that in the winter time it was too cold to keep the windows open and the stench in the classrooms was unbearable.

Mrs. Wise testified that Mr. and Mrs. Casteel have done nothing during the past eight years, except to say that they wanted their child back, which would indicate or demonstrate that they had any love or affection or feeling for this child, or concern for her well-being, not even to the extent of sending the child a birthday card.

Mrs. Wise testified in her opinion the Casteels are incapable of providing a normal home for Mary Jane. She further stated in her opinion the existing situation will not change, and that up to the time of the hearing many complaints were being received as to conditions referred to.

There is testimony that Mrs. Casteel is grossly retarded and even unable to meet her own needs on an

acceptable basis, and Mr. Casteel is also of border-line intelligence with alcoholic tendencies and a neurotic pattern of behavior.

Mrs. Wise testified that when the petition was served by the sheriff upon Mr. and Mrs. Casteel on November 10, 1971, Mrs. Casteel called the agency office and threatened to come in and clean out the whole agency.

Mrs. Florence Cowles, casework supervisor in the Department of Public Assistance, testified from the official records of her department that a visitation to the Casteel home on July 1, 1971, revealed that Mr. Casteel was in need of medical attention. Neither Mr. Casteel nor Mrs. Casteel wore dentures or glasses. The three children at that time were very poorly clothed and all their clothing was soiled. The witness testified that during the past six months prior to November 9, 1971, the date of the petition, Mrs. Casteel had not improved at all in her homemaking, the house was still very dirty with soiled clothing scattered in every room, and that suggestions for improvement made to Mrs. Casteel had been ignored. It was stated it seemed the parents were not furnishing adequate and suitable parental care.

The record discloses that on May 28, 1968, the home was almost inaccessible because of debris and muck. The kitchen was cluttered, the table had not been cleaned off but was covered with dirty dishes and left over food, which apparently had been on the table for several days. There was an old couch piled high with old clothing and junk. In every corner and around the room there was clothing which appeared to have been picked off the dump. In another room there was no furniture except two old broken down chairs and an ironing board.

The witness stated from her knowledge of the

record, the conditions she described disclosed a pattern for the whole period of time from 1963. The witness finally testified it was her opinion from her knowledge of the attitudes, the aptitudes and the abilities of this couple, they are incapable of providing a proper home for raising children.

Miss Mabel Bowmaster, the executive director with the Fayette County Tuberculosis and Respiratory Disease Association, was the next witness. Miss Bowmaster testified she came into contact with the Casteel family in 1965 when she learned that one of the Casteel children, Larry, was developing a tuberculosis problem. She arranged for medical attention. The parents neglected to follow instructions prescribed for Larry's treatment. Miss Bowmaster next encountered Larry in 1967, and it then appeared that the child's condition had worsened and that he was in need of hospitalization. Miss Bowmaster arranged through the Harrisburg office to have Larry admitted to Samuel J. Dixon Hospital for treatment. The parents refused to allow Miss Bowmaster to take the boy to the hospital. The parents were then instructed to take the child to the local clinic for further attention. They did not observe the schedule set up for his visits and were at times many months late. On October 8, 1970, the child was taken to the clinic. At that time he was eleven months late for the appointment. He was then told to return in three months. On the date of this testimony, 13 months had elapsed and the child had not been back for treatment. The treatments that were given and the drugs supplied were at no expense to the Casteels.

Miss Bowmaster testified on the occasions of her visits to the Casteel home in 1965 and 1967, she did not enter the house but stayed out on the porch because the stench was too great. Miss Bowmaster

finally testified from her observation of the Casteel home and her knowledge of Mr. and Mrs. Casteel, the parents were not providing a desirable home for their children, and in her opinion they were not capable of performing parental duties toward their children. They did not demonstrate any real concern or apprehension about Larry's condition and the care that was required to restore him to health.

Thomas R. George, Supervisor of Special Education, Laurel Highlands School District, was the final witness called by the petitioner.

Mr. George corroborated earlier testimony as to the deplorable condition of the Casteel children while attending schools under his jurisdiction. He verified the facts earlier referred to, that the filthy condition of the children created a stench which was unbearable, necessitating their removal from the classroom. Mr. George stated other social agencies were consulted for help in correcting the conditions as they then existed, but the combined efforts of all concerned were futile because of the lack of cooperation by the Casteel parents.

Mr. Lulich, Mr. Pergalski and Mr. Crawford, all connected with the school system and familiar with the problem under inquiry, particularly the Casteel home conditions, were not called as it was felt their testimony would have been cumulative. Mr. Hudson indicated he would not call them as witnesses.

The exceptants, Mr. and Mrs. Casteel, were called as witnesses in their own behalf.

Mrs. Agnes Casteel generally denied the testimony of the petitioner's witnesses. She contended her housekeeping was adequate and her care of the children should be rated satisfactory. Mrs. Casteel admitted she failed to keep appointments to visit Mary Jane at the agency offices. Her excuse was that she had no transportation to Uniontown and that no one came for her.

She stated that many times she requested that Mary Jane be returned to the Casteel home. That Mrs. Casteel did make such requests is admitted by petitioner. Mrs. Casteel testified the family received about $300 monthly in public assistance. Mrs. Casteel stated she has raised the other children and she can raise Mary Jane. She volunteered: "And if somebody has some they don't want I can even take them and raise them."

Mr. Ralph Casteel also denied the accusations of the petitioner's witnesses. His testimony offered nothing to refute or justify the recital of his deficiencies as a father. Like Mrs. Casteel, he may be the object of pity; however, he may not be relieved of censure for his complete failure to measure up to even minimal standards required of a parent in relation to child care. He, too, neglected to take advantage of opportunities to visit with Mary Jane at the agency offices in Uniontown. He stated he did not wish to see his daughter under those circumstances but preferred to await the time when they were able to have the girl returned to their home. In other testimony Mr. Casteel denied any arrangements had been made for visiting with Mary Jane at the agency offices as related by Mrs. Wise.

## FINDINGS OF FACT

The testimony abundantly supports findings of fact as follows:

1. A. The parents, Ralph Casteel and Agnes Casteel, by conduct continuing for a period of at least six months, actually eight years, have evidenced a settled purpose of relinquishing parental claim to the child, Mary Jane Casteel.

B. The parents, Ralph Casteel and Agnes Casteel, have refused or failed to perform parental duties.

2. A. The repeated and continued incapacity,

abuse, neglect or refusal of the parents, Ralph Casteel and Agnes Casteel, have caused the child, Mary Jane Casteel, to be without essential parental care, control or subsistence necessary for her physical or mental well-being.

B. The conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parents, Ralph Castel and Agnes Casteel.

## CONCLUSIONS OF LAW

The foregoing findings of fact, jointly and severally, warrant, and perhaps mandate, a conclusion of law as follows:

Ralph and Agnes Casteel, as parents of Mary Jane Casteel, have, by their conduct, forfeited parental rights to the child, Mary Jane Casteel, necessitating a judicial adjudication and decree terminating their parental rights.

## DISCUSSION

Adoption was not known to the common law, here or in England. Being a statutory creation, the law must be strictly construed.

The involuntary termination section of the new 1970 Adoption Law supplants the abandonment section of the 1953 amendment to the 1925 Act (repealed). The grounds under one and two of section 311 of the new act greatly expand and enlarge the provisions of the earlier legislation. The very significant modification in the new act is that the two clauses making up the definition of termination grounds are independent and disjunctive, rather than interdependent and conjunctive, as was was provided in the earlier abandonment section. The second ground for relief, i.e., termination, is entirely new and deals with incapacity, abuse, neglect and refusal, and leaves the door open to a finding that these conditions cannot or will not be remedied

by the parent. This latter provision reverts to the use of the conjunctive "and," which may occasion considerable debate.

It would serve no useful purpose to berate Mr. and Mrs. Casteel or scold them for the miserable plight in which they find themselves. The law, however, solicitous as it is for the welfare of young and helpless children, will exert whatever effort is necessary to rescue child victims from parental neglect or abuse. Mary Jane Casteel is such a victim. Nor can Mr. and Mrs. Casteel be heard to say this is not so, because others are furnishing Mary Jane with the material things that provide her with physical comforts. But what about the clouds of insecurity and uncertainty that engulf not only the child but also those who would, to the best of their ability, dispel those ominous clouds and give to her an identity, a fundamental right of every human being?

Neglect of parental duties, indifference, shirking responsibilities and total insensitivity to the social standards of human behavior, as evidenced by the conduct of Mr. and Mrs. Casteel, are directly in conflict with Chief Justice Bell's judgment in Jagodzinski Adoption Case, infra, where he referred to a positive duty, requiring affirmative performance on the part of parents.

While these parents vigorously contended they provided a decent home for their children, no relative, no neighbor, no friend, came forward to say a kind word for them.

The parents complained that the agency refused to return Mary Jane to their home. The agency had no choice in the circumstances. To have complied with the request would have been cruel and inhuman.

There can be no quarrel with the judicial pronouncements that the ties which bind parent and child may

not be severed except for the most clear, strong and compelling reasons. Nor should we subscribe to the puritanical doctrine that parent and child is such a sacred relationship that it must not be dissolved under any conditions.

It is obvious the legislature intended in the 1970 Adoption Act to provide a new and liberalized concept by expanding the discretionary powers of the courts and to facilitate the freeing of neglected children from the bondage of delinquent and worthless parents, to the end that such children may be afforded a chance for a better life through the adoption process. Also the new act tends to lessen the insecurity and uncertainty for adopting parents as well as adoptees, so often attendant under the earlier act.

On the question of abandonment under the earlier act, former Chief Justice Bell in Jagodzinski Adoption Case, 444 Pa. 511, wrote:

"As we pertinently said in Smith Adoption Case, 412 Pa. 501, 'The parental obligation is a positive duty and requires affirmative performance which may not be delayed beyond the statutory period by the parent if the parental right is not to be forfeited.' This parental duty has not been met by this appellant, and no adequate explanation or justification was given for his failure."

For the reasons herein recited, this

## DECREE

And now, the day and date first above written, upon consideration of the foregoing petition for involuntary termination of parental rights and of the hearing held thereon, the court finds that the facts averred in said petition are true and correct and that the parents, Ralph Casteel and Agnes Casteel, by conduct continuing for a period of at least six months, actually eight years,

have evidenced a settled purpose of relinquishing parental claim to the child, Mary Jane Casteel; that the repeated and continued incapacity, abuse, neglect or refusal of the parents, Ralph Casteel and Agnes Casteel, have caused the child, Mary Jane Casteel, to be without essential parental care, control or subsistence necessary for her physical or mental well-being, and that Ralph Casteel and Agnes Casteel have forfeited their parental rights with respect to said child, Mary Jane Casteel.

Now, therefore, it is ordered, adjudged and decreed that all parental rights of Ralph Casteel and Agnes Casteel to said child are hereby terminated, said termination to extinguish the power or the right of said Ralph Casteel and Agnes Casteel to object to or receive notice of adoption proceedings; and that the custody of Mary Jane Casteel is hereby awarded to Fayette County Child Welfare Services.

Counsel for exceptants has waived oral argument on his exceptions and agrees this decree shall be the final decree of this court for the purposes of appeal.